

SOUTHERN DISTRICT OF MISSISSIPPI
**FILED**

OCT 15 2013

J T NOBLIN CLERK
BY_____ DEPUTY

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

| | |
|---|---|
| PRAVIN KUMAR SINGH and RADHAKRISHNAN NAIR MANGALATHUMALAYIL VASUKUTTAN<br><br>Plaintiffs,<br><br>v.<br><br>SIGNAL INTERNATIONAL, LLC, SIGNAL INTERNATIONAL, INC., MALVERN C. BURNETT, GULF COAST IMMIGRATION LAW CENTER, LLC, LAW OFFICES OF MALVERN C. BURNETT, APC, GLOBAL RESOURCES, INC., SACHIN DEWAN, and DEWAN CONSULTANTS PVT. LTD. (a/k/a MEDTECH CONSULTANTS<br><br>Defendants. | Civ. No. 1:13cv393LG-JMR<br><br>COMPLAINT<br><br>Demand for Jury Trial |

## COMPLAINT

1.     Plaintiffs are part of a group of hundreds of Indian men who were trafficked into the United States in the wake of Hurricane Katrina as an exploitable source of cheap labor for Defendants Signal International, LLC, Signal International, Inc., and/or their subsidiaries or affiliates (collectively, "Signal").  Signal and the other Defendants worked together and in concert to defraud Plaintiffs out of thousands of dollars from Plaintiffs' limited resources; to falsely promise them assistance in applying for and obtaining permanent residency in the United States; to traffic them into the United States; to force them to live in prison-like camps in squalid and unsanitary conditions; to discriminate against them on the basis of their race, ethnicity, religion, and alienage; and to threaten them with financial ruin and adverse immigration consequences if they complained.

1

2.     Plaintiffs Pravin Kumar Singh and Radhakrishnan Nair Mangalathumalayil Vasukuttan, each a former employee of Signal, bring this action to recover damages for this unlawful and fraudulent conduct by Signal and its agents and co-conspirators Malvern C. Burnett, the Law Offices of Malvern C. Burnett, APC, Gulf Coast Immigration Law Center, LLC, Sachin Dewan, Dewan Consultants Pvt. Ltd., and Global Resources, Inc.  Plaintiffs bring claims against these Defendants under the Trafficking Victims Protection Reauthorization Act ("TVPRA") of 2003 (18 U.S.C. § 1595); the Civil Rights Act of 1866 (42 U.S.C. § 1981); and the laws of Mississippi and any other applicable jurisdiction for fraud, negligent misrepresentation, and breach of contract.

3.     In the aftermath of Hurricane Katrina, Signal, a Gulf-Coast based marine and fabrication company, set out to recruit hundreds of Indian welders and fitters to work in Signal's facilities in Pascagoula, Mississippi, and Orange, Texas.  To assist in this process and recruit workers on Signal's behalf, Signal relied on its agents and co-conspirators (hereinafter collectively referred to as the "Recruiter Defendants"): Defendants Global Resources, Inc. ("Global Resources"), a Mississippi labor-recruitment firm; Defendant Malvern C. Burnett, an immigration attorney with offices in Mississippi and Louisiana, and the principal and registered agent of Defendants Law Offices of Malvern C. Burnett, APC and Gulf Coast Immigration Law Center, LLC; and Defendants Sachin Dewan ("Dewan"), a labor recruiter in India, and his company Dewan Consultants Pvt. Ltd. ("Dewan Consultants").

4.     Defendants devised and participated in a scheme and venture to recruit low-cost foreign workers, including Plaintiffs, in India and the United Arab Emirates through the false promise of permanent residency in the United States.  In the words of one of the Defendants' advertisements, this promise entailed a "[j]ob guarantee" of "2-3 years" and "permanent lifetime

2

settlement in the U.S.A. for self and family." Defendants Dewan and his company Dewan Consultants, acting on behalf of Signal and in concert with the other Defendants, promised Plaintiffs and other Indian workers that they would obtain employment and receive "green cards" (*i.e.*, permanent residency) in the United States if they paid thousands of dollars that amounted to years of these workers' average income.

5.    Despite this promise and the substantial fees charged, Defendants had no intention of securing long-term employment or green cards for Plaintiffs. No Defendant took any step to apply for or help secure permanent residency status in the United States for Plaintiffs.

6.    Lured by these fraudulent promises, Plaintiffs plunged themselves and their families into debt and sold prized personal possessions to pay the mandatory "recruitment fees" charged by the Recruiter Defendants totaling over $16,000 per worker, an amount that constituted a fortune for Plaintiffs, who did not even come close to making that much in a year's worth of income. Trusting the veracity of the immigration and work benefits promised, Plaintiff Pravin Kumar Singh also relinquished stable employment in Dubai. Each Plaintiff paid the Recruiter Defendants in reasonable reliance on their promises and assurances of long-term employment and permanent residency in the United States.

7.    After receiving thousands of dollars from Plaintiffs as a result of these fraudulent promises, Defendants' main recruiting agent or partner in India and the United Arab Emirates, Dewan Consultants, told Plaintiffs that, because the permanent residency process could take years to complete and Signal's need for workers was immediate, Defendants would first assist Plaintiffs in obtaining temporary work visas, known as H-2B visas, while also applying for green cards. Each Plaintiff reasonably believed what he was told and paid the Recruiter Defendants,

3

which acted as Signal's agents and co-conspirators, with the expectation of obtaining permanent residency for themselves and for their families in the United States through work for Signal.

8.     Upon Plaintiffs' arrival in the United States, Signal required them and other Indian workers to live in fenced, guarded, overcrowded, and isolated camps.  Signal called these camps "the Reservation(s)."  It had two such camps, one in Pascagoula, Mississippi, where Plaintiff Singh was taken in January 2007, and one in Orange, Texas, where Plaintiff Vasukuttan was taken that same month.  In these camps, Plaintiffs had to endure degrading and prison-like conditions.    They were among several hundred Indian nationals crammed into trailer-like bunkhouses that were far too small for the number of men housed in them, and otherwise unfit for human habitation.  Privacy was non-existent.  Toilet and bathing facilities were insufficient. The food provided was not fit for consumption and caused Plaintiffs stomachaches and diarrhea. "Security guards" patrolled the grounds like prison guards and subjected the Indian workers to searches of their persons and belongings.

9.     To live in these prison-like conditions, Signal deducted a mandatory room-and-board fee of roughly $1,050 USD per month from Plaintiffs' paychecks.  When Indian workers requested permission to live off-site, they were told by Signal that they could do so, but that Signal would continue to deduct that amount.  Signal thus  financially compelled Plaintiffs to remain in its so-called "Reservations."  Non-Indian workers were not subjected to such squalid living conditions, degrading treatment, or extortionate room-and-board policies.

10.     Signal's discriminatory and oppressive treatment of Plaintiffs and the other Indian workers was not limited to the housing conditions imposed on them.  Signal fostered an atmosphere of fear among the Indian workers, who risked retaliation if they tried to improve their conditions.   On March 9, 2007, for example, Signal, using private security guards,

4

attempted to deport several workers in retaliation for speaking out against discriminatory conditions in Signal's labor camp in Pascagoula, Mississippi, and for seeking counsel to understand their legal rights. This incident and other threats of suspension, dismissal, and deportation—compounded with the debt and hardships endured to pay the Recruiter Defendants' "fees"—compelled Plaintiffs to remain in Signal's camps and to work for Signal despite Signal's exploitation until it terminated their employment.

11. In sum, Defendants, individually and jointly, conspired and schemed to target Plaintiffs as Indian laborers, knowing that they would be enticed by false promises of permanent residency, to lure them into the United States only to be abused and discriminated against by Signal. As a result of these abuses, Plaintiffs are entitled to relief under the TVPRA, the Civil Rights Act of 1866, and the laws of this state and of any other applicable jurisdiction.

## JURISDICTION AND VENUE

12. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal-question jurisdiction), 28 U.S.C. § 1343 (civil rights), and 28 U.S.C. § 1367 (pendent state-law claims). Supplemental jurisdiction is proper under 28 U.S.C. § 1367 because the state-law claims asserted herein arise out of the same nucleus of operative facts that support Plaintiffs' federal claims.

13. This Court has personal jurisdiction over Defendants. Signal maintains a continuing business presence in Mississippi, including but not limited to at least one shipyard in Pascagoula, Mississippi, where one of the Plaintiffs worked for Signal and a substantial part of the wrongful conduct alleged herein occurred. Global Resources is or was incorporated under the laws of Mississippi. Burnett practices law in, *inter alia*, Mississippi, and his entities—the Law Offices of Malvern C. Burnett, APC and Gulf Coast Immigration Law Center, LLC—have offices in Mississippi. Dewan and Dewan Consultants contracted with Global Resources,

Burnett, and/or Burnett's entities (Law Offices of Malvern C. Burnett, APC and Gulf Coast Immigration Law Center, LLC), and served as Signal's agent to recruit workers and deliver them for employment in, *inter alia*, Mississippi. Dewan, both individually and on behalf of Dewan Consultants, Pvt. Ltd. also traveled to Pascagoula, Mississippi, in connection with the events described herein.

14.    Venue is proper in this district under 28 U.S.C. § 1391. A substantial part of the events or omissions giving rise to Plaintiffs' claims occurred within this judicial district, as detailed below.

## PARTIES

### Plaintiffs

15.    Plaintiffs are nationals of India, of Indian race and ethnicity, and former H-2B guest workers who were recruited from the United Arab Emirates and India by Defendants and worked for Signal after arriving in the United States in January 2007.

16.    Plaintiff Pravin Kumar Singh was recruited in the United Arab Emirates and India beginning in or about July 2004. He arrived in the United States and was taken to Signal's Pascagoula, Mississippi, facilities on or about January 24, 2007.

17.    Plaintiff Radhakrishnan Nair Mangalathumalayil Vasukuttan was recruited in India beginning in or about March of 2005. He arrived in the United States and was taken to Signal's Orange, Texas, facilities on or about January 25, 2007.

### Defendants

18.    Defendant Signal International, LLC is a company organized under the laws of Delaware, with facilities in the Gulf Coast region, including Pascagoula, Mississippi.

19.    Defendant Signal International, Inc. is a corporation organized under the laws of Delaware and is the parent corporation of Signal International, LLC. At all relevant times,

6

Signal International, LLC acted as an agent and/or alter ego of Signal International, Inc., and committed all acts discussed herein with the knowledge and consent of Signal International Inc. Signal International, LLC, Signal International, Inc., and its subsidiaries and affiliates are referred herein collectively as "Signal."   Signal provides marine and fabrication services, including offshore drilling rig overhaul, repair, upgrade, and conversion.

20.     Defendant Global Resources, Inc. ("Global Resources") is or was a corporation organized under the laws of Mississippi and engaged in the business of recruiting workers from India for employment in the United States. At all relevant times, Global Resources was presided over and controlled by Michael Pol ("Pol"), a resident of Mississippi, and was his alter ego.  On June 13, 2013, Pol filed for bankruptcy under Chapter 7 before the U.S. Bankruptcy Court for the Southern District of Mississippi.  Plaintiffs are listed as creditors in Pol's bankruptcy proceeding and are seeking relief therein.  Pursuant to 11 U.S.C. § 362(a)(1), Plaintiffs have not named Pol as a defendant in this action while a stay is in place in connection with his bankruptcy proceeding.  Pol is nevertheless liable to Plaintiffs under the claims asserted herein for his participation in and perpetration of the fraudulent scheme, conspiracy, and acts alleged herein.

21.     Defendant Malvern C. Burnett ("Burnett") is an immigration attorney who maintains offices in Ocean Springs, Mississippi, and has substantial business contacts with this State.  Burnett performed legal work necessary to bring Plaintiffs and other Indian workers to the United States to work for Signal on H-2B visas.

22.     Defendant Law Offices of Malvern C. Burnett, APC ("Burnett Law Offices") is a professional law corporation organized under the laws of Louisiana that maintains offices in Ocean Springs, Mississippi.

23.     Defendant Gulf Coast Immigration Law Center, LLC ("Gulf Coast Immigration") is a limited liability company organized under the laws of Louisiana that maintains offices in Mississippi.  Defendant Burnett is the registered agent and the sole member and/or corporate officer of Gulf Coast Immigration.  Burnett, the Burnett Law Offices, and Gulf Coast Immigration operated as a joint venture and/or alter egos of each other, and will be referred to collectively below as the "Burnett Defendants," unless a distinction is drawn between them.

24.     Defendant Dewan Consultants Pvt. Ltd. (a/k/a Medtech Consultants) ("Dewan Consultants") is a private limited liability company organized under the laws of India.  Dewan Consultants has substantial business contacts with Pascagoula, Mississippi.  In 2004, Dewan Consultants contracted with Global Resources and with Burnett—through Gulf Coast Immigration—to identify and recruit Indian workers for employment in the United States.  In 2006, Dewan Consultants and the other Defendants contracted with Signal to recruit Indian workers for employment with Signal in Mississippi and Texas.

25.     Defendant Sachin Dewan ("Dewan") is the Director of Dewan Consultants. Dewan resides in India and has had substantial business contacts with Pascagoula, Mississippi, including travel to Pascagoula on behalf of Signal and Dewan Consultants.  Defendants Sachin Dewan and Dewan Consultants operated as alter egos of each other, and will be referred to collectively herein as the "Dewan Defendants," unless a distinction is drawn between them.

26.     At all relevant times, Burnett had an attorney-client relationship with each Plaintiff in connection with their visas and work in the United States, including each Plaintiffs' work for Signal.  Burnett also had an attorney-client relationship with Signal in connection with Plaintiffs' work for Signal.

8

27.    At all relevant times, the Recruiter Defendants acted as the agents and/or representatives of Signal, and were acting within the course and scope of their agency, with the full knowledge, consent, permission, authorization and ratification, either express or implied, of Signal in performing the acts alleged herein.

28.    At all relevant times, Defendants were involved in a common venture and acted in concert to recruit Indian workers, including Plaintiffs, and bring them to the United States to work at Signal, as memorialized by various oral and written communications and agreements, and were acting within the course and scope of that common venture and those agreements, with the full knowledge, consent, permission, authorization and ratification, either express or implied, of each of the other Defendants in performing the acts alleged herein.

29.    Defendants entered into a conspiracy to unlawfully recruit Indian workers, including Plaintiffs, and bring them to the United States under false pretenses to work at Signal, and the Defendants' acts alleged herein were carried out in furtherance of that conspiracy.

## FACTUAL BACKGROUND

*Defendants Recruited Plaintiffs to Work for Signal on False Promises of a Green Card and Charged Them Exorbitant "Recruiting Fees"*

30.    In March 2004, the Dewan Defendants, Global Resources (through Pol), and the Burnette Defendants concocted a scheme to recruit and transport Indian workers to the United States under false pretenses in exchange for a steep fee. In an agreement executed in March 2004 that memorialized this scheme, the Recruiter Defendants specified that they would charge the equivalent of over $10,000 to applicants for the promise of employment and permanent residency in the United States. While the Recruiter Defendants had every intention to collect these exorbitant fees—equivalent to several years' worth of salary for the average Indian worker

targeted by the scheme—they had no intention to fulfill the promise of helping the applicants obtain permanent residency in the United States.

31.     In 2004-2005 and in furtherance of this scheme, the Dewan Defendants placed advertisements in various newspapers across India and the United Arab Emirates seeking welders, fitters, and other marine-fabrication workers for employment in the United States and promising permanent residency there.  One such advertisement promised a "[j]ob guarantee" of "2-3 years," an attractive salary, and "[p]ermanent lifetime settlement in the USA for self and family" through a "green card."  The advertisements asked those interested to contact Dewan Consultants, which had offices in the United Arab Emirates and throughout India.  Plaintiffs saw these advertisements and, enticed by the representations made in them, contacted Dewan Consultants.

32.     In or around July 2004, Plaintiff Pravin Kumar Singh, a pipefitter, was  working in Dubai, United Arab Emirates ("UAE"), when he saw one of these advertisements in the *Gulf News* newspaper.  In response to the Dewan Defendants' advertisement, Mr. Singh called Dewan Consultants and visited its office in Dubai that same month.

33.     In or about February 2005, Plaintiff Radhakrishnan Nair Mangalathumalayil Vasukuttan, a pipe and structural fitter, saw one of the Dewan Defendants' advertisements in the *Malayala Manorama* in Kerala, India.  In response to this advertisements, Mr. Vasukuttan called Dewan Consultants in March of 2005, and subsequently attended meetings and testing sessions with Dewan Consultants.

34.     In telephone conversations and meetings, the Dewan Defendants told Indian workers lured by these advertisements, including Plaintiffs, that they could be employed in the United States and obtain a "green card" (*i.e.*, permanent residency status in the United States) if

10

they paid the equivalent of more than $10,000 in three installments payable to the Recruiter Defendants. The Dewan Defendants further represented that the process would take a certain number of months but repeatedly assured the applicant workers, including Plaintiffs, that they would be employed long term in the United States and would obtain green cards for permanent residency there as long as the other installments were paid. Trusting the Dewan Defendants' representations, made in coordination with the other Recruiter Defendants and in furtherance of their scheme, Plaintiffs paid the first installment in 2004-2005, as alleged below.

35.     Defendant Dewan Consultants instructed Plaintiff Singh that he could obtain a green card for work in the United States in about 15-18 months for a cost of 40,500 UAE dirham (approximately $11,024 USD) to be paid in three installments, which would be divided among the Recruiter Defendants. Dewan Consultants assured Mr. Singh that he would get a green card at the end of this process as long as this fee was paid.

36.     In or about August 2004, enticed by the promise of permanent residency and gainful employment in the United States, Plaintiff Singh paid Dewan Consultants a registration fee of 1,000 dirham (approximately $272 USD) and the first installment totaling approximately $3,675 USD. Dewan Consultants transferred about $1,222 of this amount to Burnett. Once the first installment was paid, Dewan Consultants told Mr. Singh that he was on his way to getting a green card within the following two years.

37.     As months went by after Plaintiff Singh paid his first installment, he contacted the Dewan Defendants from time to time to inquire about the progress of his green card process. The Dewan Defendants repeatedly assured Mr. Singh that the green card application process was underway and that he would hear back from the Dewan Defendants within a few months to ask for the second installment.

38.     In or about March 2005, Dewan Consultants similarly instructed Plaintiff Vasukuttan that he could obtain a green card for work in the United States in about two years for a cost of 600,000-700,000 Indian rupees (approximately $13,730-$16,020 USD) to be paid in three installments, which would be divided among the Recruiter Defendants.  Dewan Consultants assured Mr. Vasukuttan that he would get a green card at the end of this process as long as this recruiting fee was paid.

39.     On or about March 18, 2005, enticed by the promise of permanent residency and gainful employment in the United States, Plaintiff Vasukuttan paid Dewan Consultants a registration and testing fee of 2,000 rupees (approximately $45 USD) and the first installment totaling approximately $4,180 USD.  Mr. Vasukuttan was instructed to pay this first installment to Dewan Consultants ($1,260), Burnett ($1,460), and Pol ($1,460)—which he did.  Dewan Consultants told Mr. Vasukuttan that this payment would be used to start the green card process and that the second installment would become due in about 8 to 12 months.  He was instructed to wait until Dewan Consultants got back to him.

40.     In August 2005, Hurricane Katrina hit the Gulf Coast of the United States, leaving a trail of devastation, damaging off-shore oil rigs, ships, and marine platforms, and displacing thousands of Gulf-Coast residents.  As a result, Signal faced a shortage of workers to satisfy growing demand for its maritime repair and related services.

41.     In early 2006, Michael Pol, acting as the President of Global Resources, approached Signal with a proposal to address its shortage of workers and the higher demand for its services.  In phone conversations and meetings held in the first quarter of 2006, Pol told Signal, through its General Manager, Ronald Schnoor, and Vice President of Productions for Mississippi Operations, Bill Bingle, that he could deliver the fitters and welders that Signal

12

needed at no cost to Signal. Pol informed Signal that he would work with local immigration attorney Burnett and India-based recruiter Dewan to bring these workers from India. Pol explained that the workers themselves would pay for all costs and fees associated with the recruitment process, immigration processing, and travel to the United States, and Signal would not reimburse the workers for these recruiting fees. Signal would pay the workers between $14 and $18 per hour, depending upon skill level—a lower amount than the hourly rates Signal would have to pay domestic contractors. After its conversations with Pol, Signal decided to join the Recruiter Defendants' scheme of bringing Indian workers to the United States, who would now work for Signal.

42.     In or about January 2006, Dewan Consultants contacted Plaintiff Vasukuttan and instructed him to pay the second installment to continue the recruiting process for work in the United States under a green card. This second installment was for the same amount as the first: approximately $4,180 USD payable to Dewan Consultants ($1,260), Burnett ($1,460), and Pol ($1,460). Dewan Consultants told Mr. Vasukuttan that it would take about 10-12 months for the green card to be processed once the second installment was paid. Relying on the Dewan Defendants' representations, Mr. Vasukuttan paid this second installment.

43.     Also in the first half of 2006, Plaintiff Singh called Defendant Sachin Dewan to inquire about the status of his green card process. Dewan reassured Mr. Singh that the process was far advanced and that he would soon be going to the United States, as promised. Dewan advised Mr. Singh to resign from his job in Dubai and go spend some time with his family in India, since his departure to the United States was only months away. After having spent several years working in Dubai, Mr. Singh relied on Dewan's representations and resigned from his job there, returning to India in May 2006.

44.     On April 18, 2006, Signal executed a "Skilled Worker Recruitment Agreement" with Pol's company, Defendant Global Resources, authorizing Global Resources to recruit foreign skilled workers for employment at Signal "under the 'H-2B' temporary program and/or the 'permanent residence' process."  Pursuant to this agreement, Global Resources would be responsible for all costs associated with recruitment, transportation, and entry of the foreign workers into the United States and would deliver the workers "at no cost to Signal" to the airport of Signal's choice.  The costs associated with recruitment, transportation, and entry of the foreign workers into the United States would be covered by the foreign workers themselves, through the "recruiting fees" they had paid and would continue to pay before being shipped to the United States to work for Signal.

45.     On June 19, 2006, and in connection with the agreement with Global Resources, Signal executed a power of attorney with Global Resources' partner and co-venturer, Defendant Dewan Consultants, appointing it as Signal's "representative in India to facilitate the recruitment of skilled workers to the United States of America" for employment at Signal.  The power of attorney authorized Dewan Consultants to advertise, conduct seminars and trade tests, and sign any necessary legal documentation on Signal's behalf.  Thereafter, Dewan Consultants acted on Signal's behalf and in concert with the other Recruiter Defendants, to recruit Plaintiffs for Signal's employ, charging them the last installments of the "recruiting fees" under reiterated promises of permanent residency in the United States.

46.     Also in mid-2006, and in connection with the agreement with Global Resources and the power of attorney extended to Dewan Consultants, Signal entered into an attorney-client relationship with the Burnett Defendants to advise Signal on immigration issues pertaining to Signal's need for and recruitment of Indian workers.  Signal and the Burnett Defendants later

memorialized their engagement in a written retainer agreement.  Pursuant to that agreement, Signal would not be responsible for any of the Burnett Defendants' legal fees.  Rather, under the terms of the agreement, the Burnett Defendants took funds from the "recruitment fees" charged to the Indian workers, including Plaintiffs, to pay for the legal services provided to Signal.

47.    By the summer and fall of 2006, Signal wanted the Indian workers recruited—pursuant to these agreements with the Recruiter Defendants—brought to the United States as soon as possible.  To speed up the process of bringing these workers, including Plaintiffs, to the United States, the Defendants decided that Signal would sponsor the Indian workers, including Plaintiffs, on an H-2B visa, even though they were being promised green cards.

48.    The H-2B guest-worker program permits U.S. employers to import foreign workers on short-term temporary visas to meet labor needs when employers attest that they cannot find U.S. workers to perform the available jobs.  H-2B visas are non-immigrant visas, are only valid for work with the specific employer listed on the visa, and do not provide portable and/or transferable employment authorization for the visa bearer.  Temporary stay within the United States is allowed under H-2B visas for a specific and limited period that may be extended to no more than three years, after which the worker must leave the United States.  A "green card," by contrast, allows the holder to reside permanently in the United States.

49.    Unbeknownst to Plaintiffs, Defendants did not take any steps to apply for permanent residency for Plaintiffs.  Defendants only helped Plaintiffs obtain temporary H-2B visas that legally prevented Plaintiffs from working for any U.S. employer besides Signal.  Per the Burnett Defendants' advice, Signal represented to the U.S. Department of Homeland Security in mid-2006 that its need for the Indian workers was only for a 10-month period and that Signal's need was based on a one-time, peak-load temporary demand.  This representation—

unknown to Plaintiffs—was inconsistent with the Defendants' promises and representations to Plaintiffs that they would be sponsored for a green card and long-term employment in the United States.

50.     To ensure that their deception remained hidden, Defendants instructed the Indian workers to conceal from U.S. consular officials during their forthcoming H-2B visa interviews that, in addition to applying for temporary-worker status, Signal had promised them that it would sponsor them for green cards.  As Michael Pol, acting as President of Defendant Global Resources, explained to Signal's Special Projects Manager, John Sanders, in an email dated August 24, 2006:

> Mal[vern Burnett], Sachin [Dewan] or I[ ] needs [sic] to be with each and every candidate going into the consulates before their interview [because] [t]hey sometimes say the dumbest things and need to be coached on the proper way to interview. . . . [T]here are some things that should not be known to the consulate personnel, such as the fact that we are going to process them for a green card.
>
> If one of those guys says he is going to the U.S. for immigration and Signal is sponsoring him for permanent residence (green card) . . . he is a goner.

51.     Despite Pol's assertion to Signal that Defendants would "process" the Indian workers for green cards, Defendants never did so.  Yet, Defendants continued to make Plaintiffs and the other Indian workers believe that Defendants would process them for a green card sponsored by Signal.

52.     In the second half of 2006, the Dewan Defendants, acting as Signal's agent and on Signal's behalf and in furtherance of the Defendants' scheme, told Indian workers, including Plaintiffs, that, by agreeing to work for Signal on an H-2B visa, they would go to the United States sooner without affecting the green card process.  The Dewan Defendants, acting on Signal's behalf and in furtherance of the Defendants' scheme, again assured Plaintiffs and the

other Indian workers that Signal would sponsor Plaintiffs and the other Indian workers for work-authorized green cards enabling Plaintiffs and the other Indian workers to reside permanently and legally in the United States with their families.

53.     On or about September 2, 2006, the Dewan Defendants instructed Plaintiff Singh to pay the second installment to continue his recruiting process. Defendant Sachin Dewan again assured Mr. Singh that his green card was only months away. The second installment demanded by Dewan totaled approximately $5,498 USD, payable to Dewan Consultants ($3,708) and Burnett ($1,790). Mr. Singh paid this second installment on or about September 12, 2006.

54.     By this time, Dewan Consultants had received a power of attorney from Signal to recruit Indian workers, as noted above, ¶ 45. In October 2006, Defendant Sachin Dewan, acting on behalf of Signal and in concert with the other Defendants, contacted Plaintiff Singh. Dewan informed Mr. Singh that he could go to the United States relatively quickly—within the next 1 ½ months—through an H-2B visa that would be valid for a renewable 10-month period. Dewan emphasized that pursuing this visa would not affect Mr. Singh's green card process. Dewan again assured Mr. Singh that he would get a green card after that process was complete. Dewan also threatened Mr. Singh with forfeiture of the more than $8,000 USD he had already paid in recruiting fees if he withdrew from the process and refused to accept the H-2B visa. Mr. Singh agreed to take the steps Dewan instructed him to follow to obtain an H-2B visa for employment with Signal.

55.     Shortly after this conversation, Dewan Consultants instructed Plaintiff Singh to remit 4,800 rupees (approximately $105 USD) to Dewan Consultants as a visa fee. Mr. Singh did so on or about October 27, 2006, and a few days later, Dewan Consultants called to inform him about his visa interview at the U.S. Embassy in New Delhi on December 13, 2006.

17

56.     Similarly, in October 2006, Dewan Consultants, acting on behalf of Signal and in concert with the other Defendants, contacted Plaintiff Vasukuttan to inform him about the opportunity to work for Signal and invite him to a seminar in Chennai, India, where this opportunity would be discussed.  By this time, Dewan Consultants had received a power of attorney from Signal to recruit Indian workers, as noted above, ¶ 45.  On or about October 26, 2006, Mr. Vasukuttan attended the seminar in Chennai, where the Dewan Defendants, two Signal employees, and several other Indian workers were present.  Mr. Vasukuttan took and passed a trade test supervised by the two Signal employees.  The Dewan Defendants, acting on behalf of Signal and in concert with the other Defendants, told Mr. Vasukuttan and the other Indian workers in attendance that they would get a short-term visa (*i.e.*, the H-2B visa) lasting no more than one year to work for Signal but that this visa could be extended and would not affect the promised green card for permanent residency in the United States.  The Dewan Defendants reassured Mr. Vasukuttan and others that Signal would sponsor them for a green card.

57.     Within the second half of 2006 and no later than November of that year, Signal knew that the Indian workers it was recruiting and bringing to the United States through the Recruiter Defendants, including Plaintiffs, had been paying exorbitant amounts of money totaling over $10,000 USD to work for Signal.  Signal also knew that the Indian workers, including Plaintiffs, were paying this money based on the promise by Signal's agents, including Dewan Consultants, that Signal would sponsor them for a green card and permanent residency in the United States.

58.     With this knowledge, Signal continued to recruit and bring Indian workers, including Plaintiffs, through at least January 2007.  During this time, Signal did nothing to limit the broad recruiting authority it had granted to Dewan Consultants.  During this time, Signal did

18

not disclose to Plaintiffs and the other Indian workers that Signal would not sponsor them for permanent residency in the United States.

59.     After November 2006, Defendants duped Plaintiffs into paying the final installment of the "recruiting fees" and shipped them off to work for Signal.

60.     The Dewan Defendants summoned Plaintiff Singh and other Indian workers to a meeting in New Delhi on December 11, 2006, and Mr. Singh attended.  At this meeting, the Dewan Defendants—at the direction of the Burnett Defendants and acting on Signal's behalf—instructed Mr. Singh and others to lie to U.S. consular officials if asked how much they had paid in recruiting and immigration processing fees, by answering that they each only paid a total of no more than approximately $790 USD.  The Dewan Defendants also spoke highly of Signal, noting that it would provide good food and lodging to the workers, but concealing the fact that a large portion of their paycheck would be deducted to pay for these items.

61.     After Plaintiff Singh's visa interview on December 13, 2006, Dewan Consultants, acting on behalf of Signal and in concert with the other Defendants, retained Mr. Singh's passport and instructed him in early January 2007 to pay the third installment totaling approximately $7,118 USD, payable to Dewan Consultants ($4,198), Burnett ($1,460), and Pol ($1,460).  When Mr. Singh went to Dewan Consultants' Mumbai office to pay its portion of the last installment on or about January 10, 2007, Sachin Dewan told him that Signal would pay him well and provide adequate housing, and again reassured Mr. Singh that he would get a green card, sponsored by Signal.  Relying on these representations, Mr. Singh paid the third installment demanded by Defendants.  Dewan Consultants thereafter returned Mr. Singh's passport to him and gave him a plane ticket to go to the United States on January 24, 2007.

62.    Dewan Consultants similarly instructed Plaintiff Vasukuttan to remit 5,000 rupees (approximately $110 USD) to Dewan Consultants for a visa interview at the U.S. Consulate. Mr. Vasukuttan did so and travelled to Chennai, India, for the visa interview, which was scheduled for December 23, 2006.   That interview had to be rescheduled, however, because Dewan Consultants misspelled Mr. Vasukuttan's name in the paper work it supplied to the U.S. Consulate. Mr. Vasukuttan was required to pay another 5,000 rupees (approximately $110 USD) to schedule a new interview for January 4, 2007. Before the interview, the Dewan Defendants— at the direction of the Burnett Defendants and acting on Signal's behalf—instructed Mr. Vasukuttan to lie to U.S. consular officials if asked how much he had paid in recruiting and immigration processing fees, by saying that he only paid a total of no more than approximately $790 USD.

63.    After Plaintiff Vasukuttan's visa interview on January 4, 2007, Dewan Consultants, acting on behalf of Signal and in concert with the other Defendants, retained his passport and instructed him to pay the third installment totaling 340,000 rupees (approximately $7,675 USD), which included visa-processing fees and the costs of a plane ticket to the United States. Mr. Vasukuttan was further instructed to bring the money in cash to Dewan Consultants' offices in Mumbai, India.  Dewan Consultants retained Mr. Vasukuttan's passport until he paid the third installment.  In addition, Dewan Consultants indicated that, if Mr. Vasukuttan failed to pay the third installment, he would receive no refund for the previous installment payments he had made.  On or about January 24, 2007, Mr. Vasukuttan paid the third installment demanded by Dewan Consultants, which handed back his passport and gave him a plane ticket to the United States.

64.     In reasonable reliance upon Defendants' explicit and repeated promises that he would receive a green card in exchange for paying the required recruiting fees, which would enable him and his family to obtain permanent residency in the United States, each Plaintiff undertook considerable economic, social, familial, and personal sacrifices to obtain the funds necessary to cover the recruiting fees demanded. Each Plaintiff and his family are of modest means. Each Plaintiff was forced to borrow money from lenders at high interest rates (nearly 10% or more) and from family members to pay Defendants' "recruiting fees."

65.     Defendants thus induced Plaintiffs to enter into employment agreements with Signal by falsely promising to help Plaintiffs obtain green cards. Defendants actually never intended and took no steps to obtain green cards for Plaintiffs.

66.     Plaintiffs would not have paid the exorbitant fees that the Recruiter Defendants charged them had they known that Defendants' promises and representations were false, and that Defendants had failed to disclose material facts concerning the nature and terms and conditions of the immigration and work opportunities offered.

67.     After each Plaintiff paid his last installment, he was shipped off to the United States to work for Signal in late January 2007. On January 24, 2007, Plaintiff Singh boarded a flight to the United States, where Signal personnel awaited to transport him to one of its camps. Plaintiff Vasukuttan's flight to the United States was scheduled soon after his meeting at Dewan Consultants' office in Mumbai to pay the third installment. He took a taxi to the airport immediately after that meeting. On or about January 25, 2007, he boarded a flight to the United States, where Signal personnel awaited to transport him to one of its camps.

*Plaintiffs Were Taken to Signal's Prison-Like "Reservations," Subjected to Discriminatory and Degrading Conditions, and Forced to Acquiesce Under Threat of Dismissal and Deportation*

68.     Upon arrival in the United States in late January 2007, Plaintiffs were received at the airport in Houston, Texas, by Signal representatives, who escorted them and other Indian workers to buses that transported them to fenced camp grounds Signal had constructed for the purpose of housing them and the other Indian workers. After arriving in Houston on or about January 24, 2007, Plaintiff Singh was driven overnight—without being offered food or water—to Signal's camp in Pascagoula, Mississippi. Similarly, after arriving in Houston on or about January 25, 2007, Plaintiff Vasukuttan was taken to Signal's camp in Orange, Texas. In addition to Plaintiffs, Signal shipped approximately 300 Indian workers to its camp in Pascagoula, Mississippi, and over 200 such workers to its camp in Orange, Texas.

69.     Signal required the Indian workers, including Plaintiffs, to live in these camps. Signal employees and management called the camps "the Reservation(s)." They also discussed among themselves, including in emails, that housing the Indian workers in a secluded camp was preferable, as it would keep the Indians segregated from the rest of the community.

70.     Signal's camps in Pascagoula, Mississippi, and Orange, Texas, were isolated, overcrowded, unsanitary, and unsuitable for human habitation. They were miles removed from shopping areas, places of worship, and residential communities.

*Overcrowded Bunkhouses*

71.     Upon arrival at Defendant Signal's facilities in Pascagoula and Orange, Plaintiffs discovered that they were expected to live in trailer-like bunkhouses. Signal crammed no less than 20 men in each bunkhouse, with bunk-beds so tightly packed that it was difficult for Plaintiffs to move between them.

72.     The Signal labor camp bunkhouses had insufficient toilet and showering facilities for the 20 or more men housed in them.  Lines for the bathroom were consistently very long, forcing workers to wait a long time to use the bathroom or to shower in outhouses, where available.  Hot water was a luxury reserved to the lucky few who were able to use the shower first, leaving the rest to shower with only cold water.

73.     Privacy was non-existent in the bunkhouses, and Plaintiffs often experienced extreme difficulty sleeping due to the constant noise resulting from the close quarters and the comings and goings of workers who worked on different shifts.  Plaintiff Vasukuttan, for example, was assigned to the night shift and could barely sleep during the day because of the noise.  He sometimes was forced to work long hours at night only to be able to sleep 3 or 4 hours during the day due to the poor and noisy conditions in the bunkhouse assigned to him.

74.     Plaintiff Vasukuttan was assigned a cramped bunkhouse in Signal's camp in Orange, Texas, that had 10 bunk-beds for 20 men.  His sleeping quarters, shared with 19 other Indian workers, had only one bathroom for all of them.  The bunkhouse was so congested that he had little room to move.  The air conditioning and heating system continuously broke down, forcing Mr. Vasukuttan and his bunkhouse-mates to suffer through heat and cold in their tightly shared housing quarters.

75.     Plaintiff Singh was assigned a cramped bunkhouse in Signal's camp in Pascagoula, Mississippi.  His assigned bunkhouse had 11 bunk-beds for 22 men.  The bunkhouse had only two bathrooms, which were inadequate for all the men housed therein.  Mr. Singh found it difficult to move, rest, clean up, or even breath in these housing facilities.

76.     These conditions fell far short of basic requirements of habitability.  For example, the federal government's Occupational Safety and Health Administration ("OSHA") guidelines

state that bunkhouses of similar purpose should have a minimum of 50 square feet of floor space per habitant. Signal's bunkhouses offered less than 18 square feet of floor space per worker. Likewise, OSHA guidelines require bunk beds to be at least 48 inches apart from other beds. Signal's bunk-beds were so tightly packed together that workers were essentially sleeping next to each other.

77.    In internal communications, Signal personnel acknowledged that there was "overcrowding" at its camps and that "more toilet/sink capacity" was needed. Yet, as explained further below, Signal forced Plaintiffs and the other Indian workers to endure the conditions it imposed on them at its camps.

### Malnutrition and Disease

78.    The food provided by Signal was so bad and prepared in such unsanitary conditions that it triggered stomachaches for Plaintiff Singh and diarrhea for Plaintiff Vasukuttan. Poor, left-over food was often served to the workers, and the food would frequently spoil.

79.    Signal offered meals exclusively in a mess hall, which was only open during limited hours. Workers who showed up a few minutes late for a meal were denied food altogether.

80.    Signal offered food items that some Indian workers could not eat for religious or other reasons, such as pork or beef. Plaintiff Singh was one of these workers. In days when those items were offered, Indian workers, including Plaintiff Singh, ate nothing or very little.

81.    In an email to other Signal personnel, Signal Senior Vice-President & General Manager Ron Schnoor acknowledged the "bad, stale, molded, and otherwise poor quality food."

82.     As a result of the facts outlined above, Plaintiffs were malnourished while they lived at Signal's camps.

83.     Workers living in Signal's camps, including Plaintiffs, suffered from disease and health issues as a result of their living conditions and the food served to them.  As explained by Signal's manager of the Pascagoula camp:

> Our Indians have been dropping with sickness like flies. . . . [They] are getting worried and believe there are unhealthful conditions in the camp. It is true. The reason is because the plumbing was so shoddily done by GE's subcontractors, and water has leaked everywhere and stagnated as a result, which serves as a bacterial breeding ground.

### Signal's Prison-Like Surveillance and Policies

84.     Signal's camps were enclosed by fences and accessible only by a single guarded entrance.  The labor camp gates were constantly monitored by security guards retained by Signal.

85.     Signal's security guards monitored Plaintiffs' comings and goings by recording when Plaintiffs entered and exited the camps.  Their movements into and out of the camp were logged.  Signal's security guards also searched Plaintiffs' packages and bags when they entered the camps.  The guards also searched Plaintiffs' persons.

86.     Signal prohibited Plaintiffs from drinking alcohol at the camps.  It designed penalties for those who violated this rule, including suspension from work without pay.  The prohibition of alcohol was modeled after Signal's policies for conduct in the workplace despite the fact that Plaintiffs were living, not working, in Signal's camps.

87.     To enforce its camp-specific rules, Defendant Signal's personnel and/or security guards conducted surprise searches of the dormitory areas of the bunkhouses, including searches of workers' personal belongings.  In addition, Plaintiffs were not allowed to bring visitors into the camp.

88.     The camps were so isolated, with nothing around them, that Plaintiffs and other Indian workers had to rely on Signal-provided transportation to and from work and populated areas.   Aside from taking them to work, Signal would only take Plaintiffs and other Indian workers to buy groceries or the bank.   Plaintiffs and other Indian workers otherwise stayed in the camp because there was nowhere else for them to go near the camp grounds, and they lacked the means to go anywhere else.

89.     Signal did not bar its non-Indian workers from having visitors or drinking alcohol in their homes.   Nor did Signal confine its non-Indian workers to crowded bunkhouses or subject them to invasive searches of their homes or belongings and near-constant surveillance.

*Signal Charged Each Plaintiff Approximately $1,050 USD Each Month to Live in These Conditions*

90.     Signal automatically deducted approximately $35 per day ($245 per week, or approximately $1,050 per month) from Plaintiffs' and other Indian workers' paychecks for housing and food at the camps.   Plaintiffs did not understand that this amount would be deducted from their salary for housing and meals until they received their first paychecks.   Plaintiffs never knowingly authorized these deductions.   After all of these deductions, Plaintiffs netted only enough to survive and to provide minimal support to their families, yet not enough to pay the substantial debts they incurred in recruiting fees to come work for Signal and be forced to live in its camps.

91.     Signal imposed this deduction on Plaintiffs and the other Indian workers to recoup the cost of constructing and operating the camps in Pascagoula, Mississippi, and Orange, Texas. Before Signal decided to set the deduction at $35 per day, Signal's Senior Vice President and General Manager Ronald Schnoor initially recommended that Signal charge the workers $53.50 per day.   Schnoor reached that figure by calculating the amount it would take to amortize over

just ten months the entire cost Signal incurred building the camps. Schnoor dismissed the impact of this monthly fee by asserting that the Plaintiffs and their fellow workers would all be "happy campers." This assessment was based on the biased belief that Signal's living arrangements and wages were an improvement over Plaintiffs' and their Indian co-workers' previous conditions.

92.     When Indian workers complained about the poor conditions at the camps and asked to live elsewhere, Signal told them that, if they tried to live outside the camps, it would still deduct the room-and-board fees of approximately $35 per day from their paycheck. As a result, Plaintiffs—still burdened by the debt incurred to pay the Recruiter Defendants' fees, of which Signal was well aware—were left with no choice but to continue living in Signal's camps. Signal thus compelled Plaintiffs to remain in the camps it assigned to them.

93.     On top of this, Signal charged Indian workers, including Plaintiffs, for the tools they had to use at work and the pillows they were given to sleep on. Signal deducted about $400 from Plaintiff Singh's paychecks, for example, to recover the costs it spent on these items. Signal similarly deducted about $180 from Plaintiff Vasukuttan's paycheck to charge him for the very tools he was to use on the job for Signal.

94.     By exploiting Plaintiffs' precarious financial position, heavy debt load, uncertain immigration situation, and fear of job loss, Signal assured that Plaintiffs and their Indian coworkers would have no choice but to continue working at the company and living at the camps it had constructed for them, at least until Signal made enough money from the Indian workers themselves to recover the costs of building and operating the camps.

*Plaintiffs Endured Discrimination by Signal Due to Their Race, Ethnicity, Religion, and Alienage*

95.     Signal discriminated against Plaintiffs and their Indian co-workers. Workers of non-Indian race, ethnicity, or alienage were not required to live in and pay for housing and food

27

in Signal's camps.  Only the Indians brought to the United States through the Recruiter Defendants were housed there and required to pay so that Signal could recoup what it spent building the camps.  Accordingly, no other Signal employee other than the Plaintiffs and the other Indians brought in 2006-2007 by the Recruiter Defendants had to endure the poor living conditions, bad food, and prison-like environment of the camps in Pascagoula, Mississippi, and Orange, Texas.

96.    Signal's discriminatory treatment of Plaintiffs and their Indian co-workers was not limited to the room-and-board policies it imposed on them.  Signal employees taunted, abused, and verbally attacked the Indian workers.  On several occasions, for example, Signal employees in Mississippi insulted Plaintiff Singh by uttering slurs, including some that they had learned in Hindi.

97.    In an April 5, 2007, email to Signal employees Bill Bingle and Tracey Binion, Signal employee Darrell Snyder stated his opinion that it was a "misguided notion that some of these Indians can be reasoned with," and discussed his plan to engage in a "rat hunt" in the Pascagoula camp to determine who was causing "dissension" among the workers.

98.    Defendant Signal subjected Plaintiffs and other Indian workers to skills testing and re-testing, on-the-job discipline, layoffs, periods without work, unfavorable job assignments, evaluation processes, and/or other adverse employment actions or threats of such actions to which, upon information and belief, non-Indian and U.S. citizen workers were not similarly subjected.  Indian workers, including Plaintiff Vasukuttan, were required to perform demeaning janitorial work that non-Indian workers were not required to perform.

99.    Signal's on-the-job policies were strictly enforced against the Indian workers and Plaintiffs, while the same policies were not applied to or not enforced against non-Indian

workers. Signal, for instance, required Indian workers to shave for work and strictly enforced this rule against them. Failure to meet this policy would lead to suspension from work without pay for days. Signal required even Indian workers who were Sikh and wore beards in accordance with their Sikh religious beliefs to shave. Meanwhile, non-Indian workers were allowed to go to work with a beard.

100.  Signal personnel and management threatened that, if the Indian workers, including Plaintiffs, did not work according to Signal's specifications, they would be fired and/or deported to India. In the isolated and guarded atmosphere of the labor camps and grappling with the crushing debts they had incurred to come to the United States, Plaintiffs reasonably felt that Signal's statements were threatening and felt forced to continue working for Signal despite the inhuman working and living conditions to which they were subjected.

101.  Plaintiffs' continuing dependence upon Defendant Signal for their present and future immigration status and their continuing high levels of indebtedness, along with the prison-like living conditions that they had been exposed to at Signal's so-called "Reservations," reasonably caused Plaintiffs to fear serious harm and/or abuse of the legal process if they were to leave Signal's employ.

*Defendants Continued to Deceive Plaintiffs About the Prospects*
*of Obtaining a Signal-Sponsored Green Card*

102.  On several occasions in the first months of 2007, Signal personnel met with workers who asked about the promise that had been made to them about receiving green cards to live and work permanently in the United States. By this time, Signal was well aware that Plaintiffs and other Indian workers had paid large amounts of money to its Recruiter-Defendant agents to come to work for Signal in reliance on the promise that they would be sponsored for a green card.

29

103.     Rather than tell Plaintiffs and the other Indian workers honestly that Signal and its agents had not applied for permanent residency on their behalf and would not do so, Signal continued to deceive them into believing that Signal or its agents would apply for and help them obtain permanent residency status.  In meetings held with the workers in the Pascagoula camp in the first quarter of 2007, for instance, Signal representatives told Plaintiff Singh and other Indian workers that Signal would seek extensions of their H-2B visas and process their green cards.

104.     Throughout this period, Signal employees communicated and consulted with each other and with the Dewan and Burnett Defendants concerning what to tell workers, including Plaintiffs, about the status of their visas and green card applications.  Defendants maintained the illusion that Plaintiffs would receive green cards, when in reality Defendants were doing nothing to fulfill their promise.

*Signal Attempts to Send Several Workers Back to India*
*to Quell Rising Discontent at the Camps and Intimidate Plaintiffs into Acquiescence*

105.     By late February and early March 2007, some Indian workers began to consider ways of convincing Signal to improve the conditions they were forced to live and work under, and sought advice from locals outside the camp, including attorneys.  When Signal learned about this, it fueled—with the assistance of the Dewan and Burnett Defendants—an environment of fear and intimidation among the workers to quell dissent and to force acquiescence.

106.     Defendants Signal and Dewan started to pressure at least one of these workers, Sabulal Vijayan, who was placed in Signal's camp in Pascagoula, Mississippi.  After Signal learned of Mr. Vijayan's activities in pursuit of better conditions for the Indian workers, it notified one of its Recruiter-Defendant agents, Dewan, who proceeded to call Mr. Vijayan's family in India to warn that Mr. Vijayan should stop making trouble at Signal.  When news of

this and similar calls spread through the camps, Indian workers became more fearful of the consequences of complaining about the living and working conditions at Signal.

107.    Indian workers, including Plaintiffs, had been warned by Signal that, if they kept asking for better living and working conditions, they would risk termination or suspension without pay. Signal now made the threat of deportation back to India—Plaintiffs' greatest fear, given all they had gone through to obtain the green card Defendants promised—clear.

108.    On March 9, 2007, Signal locked the gate to the Pascagoula camp, thus blocking the only exit. By then, Signal had decided to terminate certain Indian workers who had tried to organize other workers and find ways to improve their situation. Signal wanted to make "an example" of these workers to the other Indian workers. Early in the morning of that day, Signal employee Darrell Snyder and several Signal security guards swept through the camp in search of those employees, found most of them, and locked them up in a room. Signal then told them that they were fired and would be deported to India. Distraught at what this meant for him and his family, one of these workers slashed his wrists in an attempt to commit suicide.

109.    Plaintiff Singh was awakened by the commotion that this incident stirred in the Pascagoula camp. When he exited his bunkhouse to see what was going on, Mr. Singh saw that one of his coworkers had cut his wrists and had blood flowing down his hands. Signal did nothing to help him, and fellow coworkers had to arrange for him to be taken to a hospital. Mr. Singh learned that this coworker and other Indian workers had been locked up in a room and told that they would be deported to India after they tried to organize to improve living conditions at the camp. The other workers that Signal had rounded up were kept in the room for hours. After approximately eight hours under Signal's custody, the workers were escorted out of the camp by Signal and handed over to a local charity.

110.   Plaintiff Vasukuttan and the other Indian workers who lived in Signal's camp in Orange, Texas, soon heard about these events and the attempted suicide of one of their co-workers in Mississippi after learning that Signal would deport this co-worker back to India.

111.   The events of March 9, 2007, generated great fear in each of the Plaintiffs and other Indian workers at Signal's camps.  Plaintiffs were scared of what Signal would do to them if they raised concerns about conditions at the camp.  Plaintiffs believed, based on Signal's conduct, that protesting their plight would lead to dismissal and deportation back to India.

112.   By its conduct on March 9, 2007, Signal intentionally created a climate of fear and intimidation in order to overawe the Plaintiffs and their coworkers into dropping their complaints about the camp and their treatment by Signal.  As alleged below, ¶¶ 114-115, the Dewan and Burnett Defendants actively fostered this climate of fear and intimidation by conceding Signal's requests to speak with the workers in the Pascagoula and Orange camps. These Defendants encouraged the Indian workers, including Plaintiffs, to acquiesce to their living conditions and continue doing their jobs without causing trouble.

*Signal, Assisted by Burnett and Dewan, Used Fraud and Coercion to*
*Keep Plaintiffs Living at the Camps and Working for Signal at Its Will*

113.   Following the March 9, 2007, incident, Signal and the Dewan and Burnett Defendants used additional fraudulent and coercive tactics to keep the workers, including Plaintiffs, under Signal's control.

114.   In or about mid-March 2007, Burnett and Dewan traveled to the camps in Pascagoula, Mississippi, and Orange, Texas, to again reassure workers that they would receive green cards and/or warn them that they should not cause any trouble for Signal, lest they face termination and deportation back to India.  Dewan participated in at least one such meeting with the Indian workers at the Pascagoula camp.  Burnett participated in at least one such meeting

32

with the Indian workers at the Texas camp to warn them not to do what the workers in Mississippi had done.

115.   That same month, Signal Senior Vice President Ron Schnoor, joined by Burnett and others, addressed the entire Pascagoula camp about what had happened on March 9th. He assured the men that Signal would continue to employ them for the "long term" if they acquiesced to their situation and continued to work.  This assurance was false, however, given that Signal still had not decided whether it would extend any of the workers beyond the initial ten-month visa period, and given that Signal thought it likely at the time that visa extensions would not be sought for certain workers.  Schnoor also threatened the workers, telling them that if any one of them filed a lawsuit against Signal, Signal would refuse to extend any of the H-2B visas for any of the workers, and would therefore send all of them back to India.  Signal knew full well that this threat would coerce the workers, including Plaintiffs, into staying at the camps, lest they return to India in crushing debt.

### After Months of Exploitation, Intimidation, and Abuse, Signal Terminates Plaintiffs Without Reason

116.   On May 28, 2007, Plaintiff Vasukuttan reported to work as usual, but the Signal supervisor in charge of his night shift told him and two of his co-workers that they had been terminated.  The Signal employee gave Mr. Vasukuttan no valid reason for his sudden dismissal.  He gave Mr. Vasukuttan three days to leave Signal's camp.  After only about four months working for Signal, having been brought by Defendants halfway around the world on the promise of a green card and long-term employment in the United States, having been charged over $16,000 in recruiting fees, and having endured Signal's abuse and discrimination in the Orange, Texas, camp, Mr. Vasukuttan was summarily dismissed.

117.    On July 24, 2007, Plaintiff Singh tried to punch his work time card and found that it did not work.  When he inquired why it did not work, a Signal supervisor told him that he had been terminated and had to return to India.  Signal refused to explain why Mr. Singh was being dismissed.  He was given two days to leave Signal's camp.  Mr. Singh's H-2B visa was set to expire in only a few days, on July 31, 2007.  After less than six months working for Signal, having been brought by Defendants halfway around the world on the promise of a green card and long-term employment, having been charged over $16,000 in recruiting fees, and having endured Signal's abuse and discrimination at the Pascagoula, Mississippi, camp, Mr. Singh was also summarily dismissed.

118.    After their dismissal from Signal, each Plaintiff separately paid the Burnett Defendants a visit to seek their help in obtaining the permanent residency status that Plaintiffs had paid the Recruiter Defendants to obtain.  Burnett charged Plaintiffs Singh and Vasukuttan $100 each for this visit.  Burnett suggested to Plaintiffs that he would follow up and help them, but he thereafter did not help them obtain what had been promised.  Although Burnett had years earlier agreed to assist in filing green card applications on behalf of Plaintiffs in exchange for the thousands of dollars they paid him, he never did so.

119.    Despite Defendants' promises to Plaintiffs of a green card and long-term employment in the United States, Defendants never applied for Plaintiffs to receive a green card and never sponsored Plaintiffs for a green card.  The Recruiter Defendants, acting in concert with each other and on behalf of Signal, guaranteed each Plaintiff a green card in exchange for over $16,000 USD, but a green card application was not even filed for Plaintiffs even though they fully paid these recruiting fees.

## FIRST CLAIM FOR RELIEF

TRAFFICKING VICTIMS PROTECTION REAUTHORIZATION ACT OF 2003

Violation of the Trafficking Victims Protection Reauthorization Act ("TVPRA") of 2003,
18 U.S.C. §§ 1589, 1590, 1592, 1594, 1595

*All Defendants*

120.   Each Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

121.   Each Plaintiff brings this claim against all Defendants pursuant to the civil remedies provision of the Trafficking Victims Protection Reauthorization Act of 2003, 18 U.S.C. § 1595.

122.   Plaintiffs are victims of violations of the following sections of Title 18, Chapter 77 of the United States Code: 18 U.S.C. §§ 1589 (forced labor), 1590 (trafficking), 1592 (unlawful conduct with respect to documents in furtherance of, *inter alia*, trafficking and forced labor), 1594 (attempt and conspiracy), and 1595 (civil remedies).

123.   Defendants subjected, attempted to subject, and conspired to subject Plaintiffs to forced labor in violation of 18 U.S.C. §§ 1589, 1594.

124.   Defendants knowingly threatened and/or conspired to threaten Plaintiffs with serious harm in order to obtain the labor and services of Plaintiffs in violation of 18 U.S.C. §§ 1589(a)(2), 1594.

125.   In violation of 18 U.S.C. §§ 1589(a)(4), 1594, Defendants knowingly obtained and/or conspired to obtain the labor and services of Plaintiffs using a scheme, plan, or pattern that, in the totality of the circumstances, was intended to cause and did, in fact, cause Plaintiffs to believe that they would suffer serious harm if they were to leave the employ of Defendant Signal.

126.    Defendants, individually or through their agents or co-conspirators, threatened to retaliate against Plaintiffs and Plaintiffs' co-workers for attempts to exercise their legal rights, threatened Plaintiffs with deportation, and deceived Plaintiffs about their immigration status in a manner that constitutes an abuse of law or the legal process under 18 U.S.C. § 1589(a)(3).

127.    Defendants knowingly confiscated and possessed and/or conspired to confiscate and/or possess Plaintiffs' passports and visa papers in the course of a violation of and/or with the intent to violate 18 U.S.C. §§ 1589 and 1594.

128.    Defendants knowingly benefitted, financially and by receiving value, from their participation in the venture that, as has been alleged herein, engaged in acts in violation of 18 U.S.C. §§ 1592, 1595(a).  Defendants knew or recklessly disregarded the fact that the venture had engaged in such violation.

129.    Defendants are the perpetrators of the acts set forth above and knowingly benefited financially from participating in a venture that they knew or should have known was engaged in the acts set forth above.

130.    In violation of 18 U.S.C. § 1594(b), Defendants conspired with each other to violate 18 U.S.C. §§ 1589, 1590, and/or 1592.

131.    Each of the acts in violation of 18 U.S.C. §§ 1589, 1590, 1592, 1594, and 1595, set forth above was carried out in furtherance of Defendants' conspiracy to unlawfully recruit Indian workers, including Plaintiffs, and bring them to the United States under false pretenses to work at Signal.

132.    Defendants aided and abetted each other in carrying out the acts in violation of 18 U.S.C. §§ 1589, 1590, 1592, 1594, and 1595, set forth above.

133.    As set forth more fully above, Defendants' scheme and conspiracy to unlawfully recruit Indian workers, including Plaintiffs, and bring them to the United States under false pretenses to work at Signal was designed to convince each Plaintiff that he would suffer serious harm if he were to leave the employ of Signal or Signal's required housing facilities.  Acts carried out by Defendants, individually or through their agents, in furtherance of this conspiracy include, *inter alia*, bringing each Plaintiff to the United States under a false promise and hope for a green card that was not even going to be sought on his behalf, charging each Plaintiff exorbitant and non-refundable recruiting fees, holding each Plaintiffs' passports without his consent until such fees were fully paid, instructing each Plaintiff to lie to U.S. consular officials in order to secure a temporary visa for him, isolating each Plaintiff in a gated camp under inhuman conditions, limiting his outside contacts, threatening deportation, withholding material information about his immigration status, maintaining each Plaintiff in debt, causing serious harm to Plaintiffs' Indian co-workers, and discriminating against each Plaintiff in violation of 42 U.S.C. § 1981.

134.    At all relevant times, the Recruiter Defendants acted as Signal's agents in carrying out the acts in violation of 18 U.S.C. §§ 1589, 1590, 1592, 1594, and 1595, set forth above.  As set forth more fully above, Signal engaged each of the Recruiter Defendants to act on its behalf in the recruitment, visa processing, and transportation of Plaintiffs and other Indian workers to the United States to work for Signal.

135.    As a direct and proximate result of Defendants' acts in violation of the TVPRA, each Plaintiff has been injured and is entitled to recover compensatory and punitive damages in an amount to be proven at trial, including attorneys' fees.

## SECOND CLAIM FOR RELIEF

VIOLATIONS OF THE CIVIL RIGHTS ACT OF 1866
42 U.S.C. § 1981

*Defendant Signal*

136.    Each Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

137.    Each Plaintiff asserts this claim pursuant to 42 U.S.C. § 1981 for declaratory relief and damages against Defendant Signal.

138.    The actions of Defendant Signal, as set forth herein, violated Plaintiffs' rights to receive full and equal benefit of all laws as guaranteed by 42 U.S.C. § 1981, including Plaintiffs' rights to enjoy and benefit from a non-discriminatory employment relationship with Signal.

139.    Specifically, Signal subjected Plaintiffs to discriminatory and mandatory room-and-board policies at Signal's camps in Pascagoula, Mississippi, and Orange, Texas.

140.    Signal did not subject its non-Indian and U.S. citizen employees to the same or similar room-and-board policies.  Signal referred to the camps where it housed Plaintiffs and the other Indian workers as "the Reservation(s)."

141.    As set forth in the preceding paragraphs, Signal also imposed discriminatory job-related requirements and adverse terms and conditions of employment to which non-Indian and U.S. citizen employees were not similarly subject.

142.    As set forth in the preceding paragraphs, through the actions and statements of its personnel referring to or directed at Plaintiffs and other Indian workers, Signal maintained an objectively hostile and abusive work environment on account of Plaintiffs' race, ethnicity, national origin, and/or alienage.

143.   As set forth in the preceding paragraphs, Signal's discriminatory and offensive treatment of Plaintiffs was sufficiently severe that it created a hostile work environment in violation of 42 U.S.C. § 1981.

144.   Plaintiffs reasonably perceived their work environment to be hostile, abusive, and discriminatory on the basis of their race, national origin, and/or alienage.

145.   Signal's hostile, abusive, and discriminatory treatment of Plaintiffs and other class members was unwelcome.

146.   Signal knowingly, willfully, maliciously, intentionally, and without justification acted to deprive Plaintiffs of their rights.

147.   As a direct and proximate result of Signal's unlawful acts, each Plaintiff has been injured and is entitled recover compensatory and punitive damages in an amount to be proven at trial, including attorneys' fees.

## THIRD CLAIM FOR RELIEF

FRAUD / FRAUDULENT MISREPRESENTATION

*All Defendants*

148.   Each Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs.

149.   Each Plaintiff brings this claim against all Defendants.

150.   As set forth in the preceding paragraphs, Defendants, individually and through their agents, employees, representatives, and/or co-conspirators, knowingly and/or recklessly made materially false and untrue statements and representations to Plaintiffs regarding the nature and terms and conditions of applications and opportunities for immigration status and employment in the United States.

39

151.    Defendants and/or their respective agents, employees, representatives, and/or co-conspirators made these representations knowing that they were false or recklessly ignoring their truth, intending that the representations would induce Plaintiffs to pay the exorbitant fees requested by the Recruiter Defendants, leave their homes in India and, in the case of Plaintiff Singh, a job in Dubai, and travel to the United States at no cost to Signal to work for the Signal.

152.    Specifically, as alleged more fully above, Defendants engaged in the following acts, among others:

- In March 2004, the Recruiter Defendants memorialized a scheme and agreement whereby they would charge the equivalent of over $10,000 to Indian workers for the promise of employment and permanent residence in the United States. The Recruiter Defendants intended to collect these exorbitant fees—equivalent to several years' worth of salary for the average Indian worker targeted by the scheme—but did not intend to fulfill the promise of helping the applicants obtain permanent residency in the United States.

- Starting in 2004 and in furtherance of this scheme, the Dewan Defendants advertised a "[j]ob guarantee" of "2-3 years" and "permanent lifetime settlement in the U.S.A. for self and family." Plaintiffs saw these advertisements and contacted the Dewan Defendants relying on the representations made therein. The Dewan Defendants represented to Plaintiffs at various times in 2004-2007 that they would obtain permanent residency and steady, long-term, and ongoing work opportunities in the United States if they paid thousands of dollars to the Recruiter Defendants. These representations were false, as the Recruiter Defendants did not intend to process permanent residency applications for Plaintiffs and, in fact, never did so.

- In 2006, Signal joined the Recruiter Defendants' recruiting scheme.  On June 19, 2006, for instance, Signal granted a broad power of attorney to Dewan Consultants, authorizing it to act on Signal's behalf as Signal's recruiting agent abroad to bring Indian workers to the United States at no cost to Signal to work for Signal.  The costs of recruiting, migration processing, and transporting these workers for Signal would be covered by the workers themselves through the Recruiter Defendants' recruiting fees.  Signal knew that Plaintiffs and other Indian workers were charged these fees and were promised green cards to go work for Signal, yet recruited them through its Recruiter-Defendant agents.

- Acting as Signal's agents, the Dewan Defendants represented to Plaintiffs in the second half of 2006 and in January 2007 that they would obtain permanent residency and long-term employment in the United States working for Signal if they completed payment of thousands of dollars to the Recruiter Defendants.  The Dewan Defendants also represented to Plaintiffs that Signal would provide adequate housing and food while it employed them.  These representations were false.

- In early 2007, after Plaintiffs had been shipped to the United States and placed in Signal's camps for Indian workers in Pascagoula, Mississippi, and Orange, Texas, Signal—with the assistance of the Burnett and Dewan Defendants—continued to deceive Plaintiffs and the other Indian workers into believing that Signal or its agents would apply for and help them obtain permanent residency status.  These representations were false and were made to ensure that the Indian workers acquiesced to the discriminatory conditions and policies Signal imposed on them.

41

153.   The representations made by Defendants, individually or through their agents, employees, representatives, and co-conspirators, that Plaintiffs would obtain permanent residency in the United States and would have steady, long-term, and ongoing work opportunities with Signal were false, and Defendants knew it.

154.   These representations were made in furtherance of Defendants' conspiracy to unlawfully recruit Indian workers, including Plaintiffs, and bring them to the United States under false pretenses to work at Signal.

155.   Plaintiffs were entitled to rely on Defendants' representations and were ignorant of their falsity.

156.   In reliance on Defendants' false representations regarding green cards and employment opportunities, Plaintiffs paid large sums of money—over $16,000 USD—to the Recruiter Defendants, which acted in concert with each other and with Signal, and on Signal's behalf as Signal's agents, in the perpetration of this fraud.

157.   In reliance on Defendants' false representations regarding green cards and employment opportunities, Plaintiffs incurred substantial interest-bearing debts (as high as 14%) in order to pay the recruitment fees charged by the Recruiter Defendants, which acted in concert with each other and with Signal, and on Signal's behalf as Signal's agents, in the perpetration of this fraud.

158.   In reliance on Defendants' false representations regarding green cards and employment opportunities, Plaintiffs sold personal property and, in the case of Plaintiff Singh, surrendered stable employment in the United Arab Emirates.

159.   In reliance on Defendants' false representations regarding green cards and employment opportunities, Plaintiffs left their homes and traveled to the United States to work for Signal.

160.   No later than the Fall of 2006, all Defendants knew that Plaintiffs believed that Defendants were going to apply for permanent residency on behalf of Plaintiffs.   While Defendants had an obligation to tell Plaintiffs that this was untrue, Defendants failed to do so. Instead, Defendants again falsely represented that Plaintiffs would receive green cards to induce them further to pay thousands of dollars, to go to the United States to work for Signal, and to acquiesce to Signal's discriminatory and oppressive policies and conduct.

161.   Defendants' actions evince malice and/or reckless indifference towards Plaintiffs.

162.   As a direct and proximate result of Defendants' knowing, willing, and intentional actions, each Plaintiff has been injured and is entitled to recover compensatory and punitive damages in an amount to be proven at trial.

## FOURTH CLAIM FOR RELIEF

NEGLIGENT MISREPRESENTATION

*All Defendants*

163.   Each Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs.

164.   Each Plaintiff brings this claim against all Defendants.

165.   As set forth in the preceding paragraphs, Defendants, individually and through their agents, employees, representatives, and co-conspirators, provided materially false and untrue information to Plaintiffs, or omitted material facts, regarding the nature and terms and conditions of applications and opportunities for immigration status and employment in the United States.   Specifically, Defendants, individually and through their agents, employees,

43

representatives, and co-conspirators, told Plaintiffs that they were processing or going to process them for a green card and long-term employment with Signal, and that Plaintiffs would obtain such green card if they paid the Recruiter Defendants' fees. Defendants and/or their respective agents represented that, in exchange for exorbitant fees, Plaintiffs would obtain permanent residency in connection with working for Signal and that Plaintiffs would have steady, long-term, and ongoing work opportunities in the United States with Signal. This information was materially false and untrue. Furthermore, Defendants failed to inform Plaintiffs that Signal would compel them to live in camps unfit for human habitation, that Signal would impose discriminatory room-and-board deductions and policies, and that Signal would neither extend their H-2B visas nor sponsor them for green cards.

166.    Defendants provided this information negligently, without exercising reasonable care in communicating the information to Plaintiffs. Defendants had no reason to believe their representations about green cards and employment opportunities were true.

167.    Plaintiffs were entitled to rely on Defendants' representations.

168.    In reliance on Defendants' misrepresentations and omissions of material facts regarding green cards and employment opportunities, Plaintiffs paid large sums of money to Recruiter Defendants, which acted in concert with each other and with Signal, and on Signal's behalf as Signal's agents, in making the negligent misrepresentations alleged herein.

169.    In reliance on Defendants' misrepresentations and omissions of material facts regarding green cards and employment opportunities, Plaintiffs incurred substantial interest-bearing debts in order to pay the recruitment fees charged by the Recruiter Defendants, which acted in concert with each other and with Signal, and on Signal's behalf as Signal's agents, in the making the negligent misrepresentations alleged herein.

44

170.   In reliance on Defendants' misrepresentations and omissions of material facts regarding green cards and employment opportunities, Plaintiffs sold personal property and, in the case of Plaintiff Singh, surrendered stable employment in the United Arab Emirates.

171.   In reliance on Defendants' misrepresentations and omissions of material facts regarding green cards and employment opportunities, Plaintiffs left their homes in India and traveled to the United States to work for Signal.

172.   No later than the Fall of 2006, all Defendants knew that Plaintiffs believed that Defendants were going to apply for permanent residency on behalf of Plaintiffs.   While Defendants owed a duty to Plaintiffs to correct any misperception in this regard, Defendants failed to do so.

173.   As a direct and proximate result of Defendants' negligent actions, each Plaintiff has been injured and is entitled to recover compensatory and punitive damages in an amount to be proven at trial.

## FIFTH CLAIM FOR RELIEF

### BREACH OF CONTRACT

*All Defendants*

174.   Each plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

175.   As set forth in the preceding paragraphs, Defendants, individually and/or through their agents, employees, and/or representatives, offered to obtain permanent residence and immigration status for Plaintiffs in the United States as well as steady, long-term work opportunities in the United States with Signal in exchange for Plaintiffs' payment of exorbitant

45

fees to Defendants or their employees, agents, and/or representatives, and agreement to work for Signal.

176.    Plaintiffs accepted Defendants' offers, paid the agreed upon fees, and performed the agreed-upon work.

177.    Defendants breached their contracts with Plaintiffs by failing to comply with their binding promises regarding permanent residence and immigration status.

178.    In reliance on these agreements, Plaintiffs paid large sums of money and entered into substantial debts, surrendered other employment opportunities, and incurred other financial losses.

179.    As a direct result of Defendants' breach, Plaintiffs have suffered damages and are entitled to recover compensatory damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request the following relief:

a.    Compensatory damages;

b.    Punitive damages;

c.    An award of Plaintiffs' reasonable costs, including attorneys' fees and costs;

d.    Such additional and further relief as the Court may deem just and appropriate.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand trial by jury in this action of all issues so triable.

Dated: October 11, 2013

MCDUFF & BYRD
Robert B. McDuff, MS Bar No. 2532
Sibyl C. Byrd, MS Bar No. 100601
Jacob W. Howard, MS Bar No. 103256
767 North Congress Street
Jackson, Mississippi 39202
Tel: (601) 969-0802
Fax: (601) 969-0804
E-mail: rbm@mcdufflaw.com
E-mail: scb@mcdufflaw.com
E-mail: jake@mcdufflaw.com

Jonathan Gimblett, *pro hac vice* (to be filed)
José E. Arvelo, *pro hac vice* (to be filed)
Jillian Willis, *pro hac vice* (to be filed)
COVINGTON & BURLING LLP
1201 Pennsylvania Ave., NW
Washington, DC 20004
Tel.: 202-662-6000 (general number)
Fax: 202-778-5474 (Mr. Arvelo's)
Email: jgimblett@cov.com
Email: jarvelo@cov.com
Email: jwillis@cov.com

*Counsel for Plaintiffs*